UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| Edward Jose Junior, | : | CASE NO. 1:21-cv-02242 |
| Petitioner, | : | JUDGE JAMES S. GWIN |
| v. | : | OPINION AND ORDER |
| Aline Ferreira de Sousa, | : | [Resolving Doc. 1] |
| Respondent. | : | |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

After a bench trial, the Court decides this child abduction case brought under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention").[1]

Petitioner Edward Jose Junior ("Jose Junior") seeks an order compelling the return of his seven-year-old child, A.S.C., to Brazil. In his petition, Jose Junior alleges that in 2020 his ex-wife and A.S.C.'s mother, Respondent Aline Ferreira de Sousa ("Ferreira de Sousa"), wrongfully removed A.S.C. from Brazil.

For the following reasons, the Court **GRANTS** Jose Junior's petition and **ORDERS** that A.S.C. be returned to Brazil.

## I. Background

[1] The Hague Convention on the Civil Aspects of International Child Abduction, Mar. 26, 1986, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11, as implemented by the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq.*

Petitioner Edward Jose Junior, child A.S.C., and Respondent Aline Ferreira de Sousa are Brazilian citizens.[2] In addition, Respondent de Sousa's current husband is also a Brazilian citizen.[3]

In 2011, Petitioner Junior and Respondent de Sousa married in Brazil. They later divorced in 2013.[4] After the divorce, they continued some relations, and in 2015, Ferreira de Sousa gave birth in Brazil to their child, A.S.C.[5] Jose Junior and Ferreira de Sousa dispute the type of relationship they had after the divorce and when they stopped living together as a family. Respondent-mother Ferreira de Sousa remarried in 2019.[6]

On July 3, 2020, Brazil's 1st Family and Probate Court of the District of Anapolis ("the Brazilian Family Court") granted mother Ferreira de Sousa full custody of A.S.C. and gave father and Petitioner Jose Junior visitation rights.[7] Petitioner Jose Junior kept parental responsibility, including the right to make decisions about changes in A.S.C.'s habitual residence and the power to deny consent to Ferreira de Sousa taking A.S.C. to another country.[8]

A.S.C. spent weekdays with her mother, Ferreira de Sousa, and weekends with her father, Jose Junior.[9] A.S.C. also spent school holidays with her father.[10] Father Jose Junior

[2] Doc. 27 at 3 (PageID 58).
[3] Trial Tr. at 55.
[4] Doc. 27 at 3 (PageID 58).
[5] *Id.*
[6] Trial Tr. at 64.
[7] The Brazilian Family Court's March 2020 Custody Order.
[8] The Brazilian Civil Code, Art. 1.634, IV-V; Doc. 1-3 at 2 (PageID 24).
[9] Trial Tr. at 24; Doc. 43-1 at 8 (PageID 129).
[10] Trial Tr. at 31; Doc. 43-1 at 8 (PageID 129).

did not have court-ordered visitation rights every weekend, but Ferreira de Sousa let him see A.S.C. more often than what was ordered by the court.[11]

On October 28, 2020, Ferreira de Sousa took A.S.C. out of Brazil without informing father Jose Junior.[12] Ferreira de Sousa and A.S.C., along with Ferreira de Sousa's current husband, travelled to the United States through Colombia, Guatemala, and Mexico.[13] In December 2020–April 2021, Ferreira de Sousa and A.S.C. lived in Parma, Ohio, where Ferreira de Sousa reported her husband had worked in the United States since approximately 2019.[14] De Sousa's current husband is a Brazilian citizen and is not a United States citizen.[15] On April 8, 2021, mother de Sousa, her current husband, and child A.S.C. moved to New Brunswick, Ohio and have remained there since then.[16]

When father Jose Junior last saw A.S.C. on October 12, 2020, she told him that her mother planned to take her to the U.S.[17] Jose Junior became concerned, contacted the Brazilian Family Court, and was assured that A.S.C. could not leave Brazil without his authorization.[18]

Four days after Petitioner Junior's last visit with A.S.C., his sister went to the mother's, Ferreira de Sousa's, home to pick up A.S.C. for A.S.C.'s weekly visit with Petitioner Junior, but nobody was home.[19] Jose Junior's sister tried again and had no luck on October 24,

---

[11] Doc. 43-1 at 8 (PageID 129); Trial Tr. at 24; Doc. 27 at 4 (PageID 59); Respondent's Deposition at 23.
[12] Doc. 27 at 4 (PageID 59).
[13] Trial Tr. at 74; Respondent's Deposition at 16, 49-50.
[14] Respondent's Deposition at 12,13.
[15] Trial Tr. at 55.
[16] *Id.* at 11.
[17] Doc. 27 at 4 (PageID 59).
[18] *Id.*
[19] *Id.*

2020, when it was Jose Junior's weekend with A.S.C., as per the court order.[20] Mother Ferreira de Sousa's family told Petitioner Junior that Respondent de Sousa and A.S.C. were at the beach and travelling within Brazil.[21]

On November 19, 2020, Jose Junior reported to the Northern Guardianship Council that he had been unable to contact A.S.C. and suspected that Ferreira de Sousa had taken her out of the country.[22] A counselor with the Guardianship Council North visited mother Ferreira de Sousa's home twice, but could not find anyone both times.[23] Ferreira de Sousa's sister again told the counselor that mother Ferreira de Sousa and A.S.C. were traveling in Brazil.[24]

On January 4, 2021, Jose Junior reported to the Brazilian Federal Police, who then revealed that a passport was issued for A.S.C. in August 2020.[25] The authorization form for child A.S.C.'s passport allegedly showed Jose Junior's signature.[26] After an investigation, the Brazilian Federal Police concluded that Jose Junior's signature was forged.[27] For this fraud, Respondent Ferreira de Sousa was subsequently sentenced to four years in prison.[28]

On April 10, 2021, Jose Junior filed his Hague Convention application with the Brazilian Central Authority, which transmitted it to the United States Department of State.[29] On October 25, 2021, Jose Junior filed his petition with the United States District Court for

[20] *Id.*
[21] *Id.*
[22] Doc. 1-4 at 2 (PageID 27).
[23] *Id.*
[24] *Id.*
[25] Doc. 1-5 at 2 (PageID 30).
[26] *Id.*
[27] Brazilian Federal Police's September 14, 2021 Report.
[28] Ferreira de Sousa's Sentencing.
[29] Hague Convention Application.

the District of Maryland.[30] A month later, the Maryland district court transferred the case to this Court.[31]

On July 13, 2021, Ferreira de Sousa applied for asylum based on domestic violence and included both her new husband and A.S.C. on her application.[32] Her asylum application is currently pending before United States Citizenship and Immigration Services.

## II. Discussion

### A. The Framework of the Hague Convention

The Hague Convention seeks to address the problem of international child abductions during domestic disputes.[33] The Hague Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that [custody rights] under the law of one Contracting State are effectively respected in the other Contracting States."[34]

Both Brazil and the United States are contracting parties to the Hague Convention. Establishing procedures for Hague Convention cases in the United States, the International Child Abduction Remedies Act (ICARA) "authorizes a person who seeks a child's return to file a petition in state or federal court and instructs that the court 'shall decide the case in accordance with the Convention.'"[35]

A court adjudicating a petition under the Hague Convention must remain mindful of two overriding principles: "First, a court in the abducted-to nation has jurisdiction to decide

---

[30] Doc. 1.
[31] Doc. 12.
[32] Doc. 30 at 2 (PageID 69).
[33] *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).
[34] Hague Convention, art. 1.
[35] *Id.* (quoting 22 U.S.C. § 9003(d)).

the merits of an abduction claim, but not the merits of the underlying custody dispute. . . . Second, the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court."[36]

If a petitioner establishes a prima facie case of wrongful removal under the Hague Convention, the burden shifts to the respondent to demonstrate an exception to the general rule that a wrongfully removed or retained child must be returned to the child's country of habitual residence.[37]

**B. Brazil's Adjudication of Jose Junior's Hague Convention Petition**

On December 15, 2022, and after Respondent Ferreira de Sousa brought A.S.C. to the United States, the 1st Federal Court in Anapolis, Brazil ("the Brazilian Court") issued a ruling on a Hague Convention petition that Jose Junior filed in Brazil. The Brazilian Court ordered the return of A.S.C. to Brazil.[38] Jose Junior presented the Brazilian Court decision as evidence in favor of his petition before this Court.

Under ICARA and the Hague Convention, Hague Convention petitions should be decided by the country where the child is at the time the petition is filed.[39] Other United States courts have looked at where the child was when the petition was filed to determine which court could adjudicate the petition.[40] While this Court takes the Brazilian Court's

---

[36] *Friedrich v. Friedrich* ("Friedrich II"), 78 F.3d 1060, 1063–64 (6th Cir.1996) (internal citations omitted).
[37] 22 U.S.C. § 9003(e)(2).
[38] Doc. 43-1.
[39] The ICARA explains that anyone seeking to initiate judicial proceedings under the Convention may do so by filing a petition in any court which has jurisdiction in the place where the child is located at the time the petition is filed. 22 U.S.C. § 9003(b). If one Contracting State, which receives a Hague application, has reason to believe that the child is in another Contracting State, it should transmit the application to that Contracting State. Hague Convention, Article 9.
[40] *See, e.g.*, *Diorinou v. Mezitis*, 132 F. Supp. 2d 139, 146 (S.D.N.Y. 2000) (deciding that the Greek court could adjudicate the petition because the children were in Greece when the petition was filed there).

opinion into consideration, this Court will conduct its own Hague Convention analysis below since A.S.C. was in the United States when Jose Junior filed his petition.

### C. Jose Junior's Prima Facie Case

When seeking an order to compel the child's return to another Hague Convention country, petitioners have the burden of demonstrating by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention."[41]

Under the Hague Convention, a child's removal is wrongful if: (1) immediately before the removal, the child habitually resided in another Contracting State, (2) the removal violated the petitioner's custody rights, and (3) at the time of removal, the petitioner was exercising or would have exercised custody rights, either jointly or alone, but for the removal or retention.[42]

Here, Jose Junior meets all of the three elements and established a prima facie case of wrongful removal.

#### 1. A.S.C. habitually resided in another Contracting State.

The evidence shows that A.S.C. habitually resided in Brazil, another Contracting State, before she was removed to the United States. Jose Junior, Ferreira de Sousa, and A.S.C. are all citizens of Brazil and had lived in Brazil their entire lives before 2020.[43] A.S.C. attended school, participated in extracurricular activities, and received medical care in Brazil.[44]

---

[41] 22 U.S.C. § 9003(e)(1)(A).
[42] Hague Convention, art. 3.
[43] Doc. 27 at 3 (PageID 58).
[44] *Id.*

2. **A.S.C.'s removal violated Jose Junior's custody rights.**

Per the Hague Convention, Jose Junior would only be able to receive the remedy of A.S.C.'s return if he had custody rights, as opposed to visitation or access rights, at the time of removal. More specifically, Jose Junior must have custody rights that were violated by the child's removal.[45]

The Hague Convention defines custody rights as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."[46] For the purposes of the Hague Convention, the petitioner's authority to require his consent to the child's international travel or relocation to another country, otherwise known as a *ne exeat* right, is a custody right.[47]

To identify the substance of the petitioner's rights over the child, the Hague Convention instructs Contracting States to look to the domestic law of the Contracting State in which the child habitually resided immediately before the removal.[48] Custody rights may "arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."[49] The Hague Convention's definition of custody rights controls, even if a Contracting State does not normally label such rights as custody rights.[50]

In this case, because A.S.C. habitually resided in Brazil immediately before her removal to the United States, this Court looks to Brazilian law to determine if Jose Junior has

[45] Hague Convention, art. 3(a).
[46] Hague Convention, art. 5(a).
[47] *Abbott*, 560 U.S. at 10.
[48] Hague Convention, art. 3(a).
[49] Hague Convention, art. 3.
[50] *See Abbott,* 560 U.S. at 10 ("This Court consults Chilean law to determine the content of [the petitioner's] right, while following the Convention's text and structure to decide whether the right at issue is a 'righ[t] of custody.'").

custody rights over A.S.C.

The Brazilian Civil Code gives Petitioner Junior the right to require his consent to A.S.C.'s international travel and residency change if it involves a different municipality.[51] Jose Junior can refuse to consent and Junior's travel consent refusal acts to prohibit A.S.C. from legally leaving Brazil. Under the Hague Convention, that veto power counts as a custody right.[52] Jose Junior holds such a custody right, yet he did not get an opportunity to exercise it before A.S.C. left Brazil. Because of that, A.S.C.'s removal violated Jose Junior's custody rights.

Later, in September 2022, the Brazil Family Court granted Jose Junior sole custody of A.S.C.[53] This responded to Ferreira de Sousa's taking A.S.C. out of Brazil without Jose Junior's consent. Since the Family Court issued this custody order after A.S.C.'s removal, it does not affect the wrongful removal analysis here.

Generally, any custody order that was issued after the child's removal is known as a chasing order. Courts typically do not defer to chasing orders. Because the purpose of the Hague Convention is to restore the pre-removal status quo,[54] courts look to the petitioner's custody rights at the time of removal.[55] As discussed above, Jose Junior had custody rights, or a *ne exeat* right, at the time of removal. And the removal violated that right.

**3. Jose Junior would have exercised his custody rights but for the removal.**

---

[51] The Brazilian Civil Code, Art. 1.634, IV-V; Doc. 1-3 at 2 (PageID 24).
[52] *Abbott*, 560 U.S. at 10.
[53] The Brazilian Family Court's September 2022 Custody Order.
[54] *Friedrich II*, 78 F.3d at 1064.
[55] *White v. White*, 718 F.3d 300, 306–07 (4th Cir.2013) (collecting cases).

Finally, Jose Junior must prove that at the time of removal, he exercised or would have exercised his custody rights but for the removal. Because Jose Junior has valid custody rights, he cannot fail to exercise it under the Hague Convention "short of acts that constitute clear and unequivocal abandonment of the child."[56]

Jose Junior did not abandon A.S.C. He spent weekends and holidays with her. When Jose Junior learned of Ferreira de Sousa's plan to take A.S.C. to the U.S., he went to the Family Court and made sure that he could exercise his veto power to prevent A.S.C. from traveling to the U.S. Then he went to the Northern Guardanship Council and Brazilian Federal Police when he was unable to locate A.S.C. That is sufficient to satisfy this element.

### D. Ferreira de Sousa's Affirmative Defenses

Once a petitioner has successfully established its prima facie case of wrongful removal, the child must be returned unless the respondent can establish one of the narrow Hague Convention defenses or exceptions, two of which Ferreira de Sousa raises.

A court is not required to order the return remedy if (1) there is a grave risk that the return of the child "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation"[57] or if (2) the return of the child "would not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms."[58] The respondent must establish either defense by clear and convincing evidence.[59]

---

[56] *Friedrich II*, 78 F.3d at 1066.
[57] Hague Convention, art. 13(b).
[58] Hague Convention, art. 20.
[59] 22 U.S.C. § 9003(e)(2).

A court should not use any of the defenses to avoid return of a child merely because the court "believes it can better or more quickly resolve a dispute."[60] "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention."[61]

### 1. Grave risk defense

A grave risk of harm can exist "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."[62] The Sixth Circuit had previously set a framework to identify which cases involve grave risk of harm:

> In a Hague Convention case, our precedent establishes three broad categories of abuse: minor, clearly grave, and cases in the middle, in which the abuse "is substantially more than minor, but is less obviously intolerable." *Simcox*, 511 F.3d at 607–08. A case involving relatively minor abuse would likely not pose a grave risk to the child nor place the child in an intolerable situation. *See id.* at 607. In such cases, the district court has no discretion to refuse the petition to return because the [grave-risk] threshold has not been met. *Id.* A case in which the abuse is clearly grave typically involves "credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id.* at 607–08. Cases in the middle category call for a fact-intensive inquiry into "the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* at 608.[63]

Here, Ferreira de Sousa says that A.S.C.'s return to her father, Jose Junior, in Brazil will put A.S.C. at a grave risk of harm due to his history of domestic violence. But the Court disagrees. At best, Petitioner Junior threatened Ferreira de Sousa after she earlier removed

---

[60] *Friedrich II*, 78 F.3d at 1067.
[61] *Id.* (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)).
[62] *Id.* at 1069.
[63] *Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022) (quoting *Simcox v. Simcox*, 511 F.3d 594, 600 (6th Cir. 2007)).

A.S.C. from Brazil by misleading Petitioner Junior. Those limited acts do not establish the grave-risk defense by clear and convincing evidence.

Ferreira de Sousa points to certain threatening messages that Jose Junior sent her on WhatsApp. This occurred in 2017 during Ferreira de Sousa and A.S.C.'s earlier trip to the United States. Jose Junior says he consented to the 2017 trip because he thought they were going to visit Disneyland, but Ferreira de Sousa allegedly misled him and actually took A.S.C. on a trip to see her then-boyfriend and her now-husband.[64] When Jose Junior found out and was unsure if A.S.C. would return to Brazil, he threatened to kill Ferreira de Sousa and her family if she did not bring A.S.C. back.[65]

But Jose Junior did not follow through on his threats after Ferreira de Sousa and A.S.C. returned to Brazil. Jose Junior continued to have a relationship with A.S.C. after she returned. The pictures that Jose Junior presented during the bench trial make it clear A.S.C. spent a good amount of time with him and his family after the 2017 trip.

Ferreira de Sousa testified that Jose Junior was also physically abusive toward her.[66] But there is no evidence of that. Ferreira de Sousa did file domestic violence reports, saying Jose Junior threatened to kill her again in December 2018. She obtained a restraining report against Jose Junior after that incident. Later, on October 5, 2021, the Brazilian Court dismissed these domestic violence allegations against Jose Junior due to a lack of evidence.[67]

A.S.C. saw Jose Junior on weekends and holidays for more than 22 months while these domestic violence charges were pending and A.S.C. was still in Brazil. Aline has not

[64] Trial Tr. at 18.
[65] Trial Tr. at 18-20, 44.
[66] Trial Tr. at 37, 41.
[67] Dismissal of Domestic Violence Charges.

presented any evidence of harm toward A.S.C. during that period. Nor has she shown why a grave risk of harm would exist if A.S.C. returns. Aline also has not shown that Brazil would be incapable or unwilling to give A.S.C. adequate protection as if it is later needed. For these reasons, Ferreira de Sousa's grave risk defense fails.

**2. Public policy defense**

The Court similarly rejects Ferreira de Sousa's argument that the United States' human rights principles bar the return of A.S.C. This public policy defense should only be invoked only on "'the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'"[68] Ferreira de Sousa has not met that high standard.

**3. Pending asylum application**

Ferreira de Sousa also requests that this matter be held in abeyance until the United States Citizenship and Immigration Services ("USCIS") decides on her asylum application.[69] Although having a pending asylum application is not an official defense under the Hague Convention, Ferreira de Sousa uses her pending application to support both above defenses. According to Ferreira de Sousa, the Court should wait for the outcome of her asylum proceedings because the possible grant of asylum would be evidence that she and A.S.C. would face a grave risk of harm if they return to Brazil. Ferreira de Sousa goes on to say that returning A.S.C. to Brazil before USCIS evaluates her claim would likely violate the international norm of non-refoulement, which prohibits a country from sending individuals

---

[68] *Hague Int'l Child Abduction Convention; Text and Legal Analysis,* 51 Fed. Reg. 10510 (March 26, 1986)).
[69] Doc. 30 at 4, 7-8 (PageIDs 71, 74-75).

back to a country where they face persecution.[70] Finally, Ferreira de Sousa argues that A.S.C.'s return to Brazil—before Ferreira de Sousa's asylum application is adjudicated—would offend due process and ought to shock the conscience of the Court.

Despite Ferreira de Sousa's arguments, the Court has the authority to order A.S.C.'s return when Ferreira de Sousa's asylum application is still pending. The adjudication of an asylum application and a Hague petition may involve similar considerations regarding the child's safety. But in a Hague case, the district court "has a separate and exclusive responsibility to assess the applicability of a [grave-risk] defense."[71] In *Salame v. Tescari*, the Sixth Circuit affirmed a district court's decision to order the child's return *after* the child was granted asylum.[72] There, the Sixth Circuit made it clear that "a grant of asylum does not substitute for the district court's determination that [the respondent] failed to establish an Article 13(b) affirmative defense based on grave risk of harm or intolerable situation."[73]

Hague and asylum cases have different evidentiary burdens. In a Hague case, the petitioner must establish the grave risk and public policy defenses by clear and convincing evidence, a higher evidentiary burden than that of asylum proceedings.[74] Asylum seekers must prove their eligibility by a preponderance of the evidence, a lower standard.[75] Additionally, a petitioner gets to dispute the respondent's defenses in a Hague case, but does not have the same opportunity in the respondent's asylum proceedings.[76] For these reasons,

---

[70] *See* Article 33 of the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A. S. No. 6577, 606 U.N.T.S. 267 (1967).
[71] *Salame*, 29 F.4th at 772–73.
[72] *Id.*
[73] *Id.* at 772.
[74] *See* 22 U.S.C. § 9003(e)(2).
[75] *See* C.F.R. § 1208.13(a), (b)(1)(i).
[76] *Salame*, 29 F.4th at 772.

it can be more difficult to prove either the grave risk or public policy defense in a Hague case than to prevail in asylum proceedings.

Here, as discussed above, the Court finds that Ferreira de Sousa has not established the grave risk or public policy defenses. Ferreira de Sousa has not explained how the outcome of her asylum proceedings would affect her defenses here. Nor has she pointed to any additional evidence that she expects to obtain later and would affect the Court's analysis of her defenses in this case. The higher evidentiary burden here further cuts against Ferreira de Sousa's arguments for waiting until the asylum application decision. Holding this matter in abeyance would only conflict with the purpose of Hague Convention, which is to provide for a *prompt* return of the child.

## III. Conclusion

For the foregoing reasons, the Court **GRANTS** Petitioner Jose Junior's petition for the return of A.S.C. and **DENIES** Respondent Ferreira de Sousa's request to hold this matter in abeyance. The Court **DIRECTS** Respondent Ferreira to return A.S.C. to Brazil within thirty (30) days of the date of this Opinion and Order. The Court further **ORDERS** the parties to discuss a method for A.S.C.'s return in a manner that best serves her interest and to provide the Court with a detailed return plan within fourteen (14) days. If the parties cannot come to an agreement, they shall notify the Court before the deadline.

IT IS SO ORDERED.

Dated: June 27, 2023

*s/ James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE